Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Dan Fruchter
Jeremy J. Kelley
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 2:18-CR-00232-TOR-1 |
| Plaintiff, | 2:19-CR-00021-TOR-1 |
| | 2:20-CR-00144-TOR-1 |
| v. | 2:20-CR-00145-TOR-1 |
| WILLIAM OLDHAM MIZE, IV, | United States' Sentencing Memorandum |
| Defendant. | November 6, 9:00 a.m. - Spokane |

The United States of America, by and through Vanessa R. Waldref, United States Attorney for the Eastern District of Washington, and Dan Fruchter and Jeremy J. Kelley, Assistant United States Attorneys, hereby submits its memorandum concerning sentencing. The United States recommends a 144-month total sentence of incarceration, 3 years of supervised release that includes all conditions recommended in the Presentence Investigation Report (PSR, 2:18-CR-00232-TOR-1; ECF No. 1055) and in Paragraph 12 of the Plea Agreement, no additional criminal fine, restitution of $7,193,608.99, and a special penalty assessment of $100.

UNITED STATES' SENTENCING MEMORANDUM – 1

I.    <u>Review of the Presentence Investigation Report, Offense Level and Criminal History</u>

The United States has reviewed the draft (ECF No. 1053) and final PSRs (ECF No. 1055) prepared by the United States Probation Office and does not have any objections.

The United States concurs in the PSR's calculation of the relevant offense levels.  Specifically, for the offense of Conspiracy to Commit Wire and Mail Fraud (2:18-CR-00232-TOR-1), the United States agrees that the base offense level is **7** pursuant to U.S.S.G. § 2B1.1; that the offense level is increased by **18** because the amount of loss is between $3,500,000 and $9,500,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(J); that the offense level is increased by **2** because the offense involved 10 or more victims pursuant to U.S.S.G. § 2B1.1(b)(1)(2)(A)(i); that the offense level is increased by **2** because Defendant relocated the scheme to another jurisdiction to evade law enforcement and because the offense involved the use of sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10); and that the offense level is increased by **2** because the offense involved the conscious and reckless risk of death or serious bodily injury pursuant to U.S.S.G. § 2B1.1(b)(16).  PSR, ¶¶ 432-436.  The United States further agrees that the offense level is increased by **4** pursuant to U.S.S.G. § 3B1.1(a) because Defendant was a leader and organizer of a criminal activity that involved five or more participants and was otherwise extensive.  PSR, ¶ 438.    Finally, the United States agrees that the offense level is increased by **2** pursuant to U.S.S.G. § 3C1.1, 2J1.6 n.3 because Defendant obstructed justice, resulting in a total modified offense level of **37** prior to acceptance of responsibility.  PSR, ¶¶ 439-440.  The United States further agrees that Defendant's offense level should be adjusted downward by 2 levels for acceptance of responsibility, for a total

//

//

//

UNITED STATES' SENTENCING MEMORANDUM – 2

adjusted offense level of **35**.  PSR, ¶ 442; Plea Agreement, ¶ 9(f).[1]  The United States also agrees with the calculation of Defendant's tax offense in the PSR, and with the grouping of that offense with the conspiracy to commit wire and mail fraud set forth above.

The United States agrees that Defendant's criminal history category is I and that Defendant has zero scored criminal history points.  PSR, ¶ 453.  Defendant, however, is not eligible for a zero-point reduction pursuant to U.S.S.G. § 4C1.1 because he received an aggravating role enhancement.  U.S.S.G. § 4C1.1(a)(10).[2] The relevant sentencing guideline range is therefore 168-210 months.

II.    Departures

The United States does not believe that any upward or downward departures under the Sentencing Guidelines are warranted.

_____

[1]    The Draft PSR included a 3-point reduction for acceptance of responsibility; however, undersigned counsel have discussed with the USPO, who indicates that this was an oversight, and that, pursuant to the Plea Agreement, Defendant should only receive a 2-level reduction for acceptance.  The final PSR so reflects.

[2]    As discussed more fully *infra*, the Sentencing Guidelines are being non-substantively amended, effective November 1, 2024, to clarify that *any* Defendant who receives an aggravating role enhancement pursuant to U.S.S.G § 3B1.1 is not eligible for a zero-point reduction under § 4C1.1.  However, in this case, even setting aside the aggravating role enhancement, Defendant would independently not be eligible for a zero-point reduction because he used violence in connection with the offense (U.S.S.G. § 4C1.1(a)(3)) and because the offense resulted in serious bodily injury (U.S.S.G. § 4C1.1(a)(4)).  Defendant disputes application of both provisions. As discussed below, in light of the aggravating role enhancement, the Court need not determine whether either or both of these provisions would further independently disqualify Defendant from relief under the zero-point offender reduction.

III.   Defendant's Objections to the PSR

Defendant has filed several objections to the Draft PSR, which the United States believes are appropriately addressed in the final PSR.   For example, Defendant objects to inclusion in the PSR statements of a witness that Defendant had made a threat that if "someone were to cross him, he would shoot that person." PSR, ¶ 130.  Defendant objects that the statement is "uncorroborated" and "does not appear to have any connection whatsoever to the criminal conduct".  ECF No. Def. Obj., pp. 3-4.  The PSR, however, does not state conclusively that Defendant made this statement; it simply accurately states that witnesses told investigators that Defendant did so, and also notes that other witnesses denied that Defendant threatened co-conspirators into participating.   PSR, ¶¶ 130, 242.  Moreover, Defendant's argument that such statements are unrelated to Defendant's criminal conduct is simply inaccurate.   Defendant was charged, and convicted, with conspiracy.  It is well-settled that threats to co-conspirators are directly relevant to, and in furtherance of, a conspiracy.  *See, e.g., U.S. v. Reyes-Garcia*, 794 Fed. App'x 567, 571 (9th Cir. 2019).

Defendant also objects to information in the PSR concerning participants having their teeth removed as part of the conspiracy, including with a screwdriver and hammer.  Def. Obj. at 5; PSR, ¶ 131.  While Defendant is correct that two of his co-conspirators have different recollections of a particular event, that Defendant's scheme purposefully caused injuries to the teeth and mouths of co-conspirators is not in dispute.  The PSR is replete with information about how, at Defendant's direction, the staged collisions frequently involved participants drinking from bottles at the times of the staged collisions, in order to increase payouts by claiming causing additional mouth, jaw, and face injuries.  *See, e.g.,* PSR, ¶¶ 62, 120, 161, 175, 259, 283, 324, 330.  In fact, the very co-conspirator that Defendant cites indicated that Defendant pressured him to "break two of his own teeth with a pair of pliers" and that the co-conspirator, under that pressure, did so.  *See* Report of Investigation,

UNITED STATES' SENTENCING MEMORANDUM – 4

Interview of Misael Reyes-Tajimaroa, attached hereto as Exhibit 1, at 2. Moreover, that Defendant removed this co-conspirator's teeth, or forced him to do so on his own, is corroborated by the statement of one of the co-conspirator's associates in which he indicated that when this co-conspirator would return from participating in one of Defendant's staged collisions, "he would have teeth missing." *See* Memorandum of Interview, attached hereto as Exhibit 2, at 1.

Defendant argues that the PSR "does not indicate that the injuries were either superficial or pre-existing". Def. Obj. at 5. Putting aside that purposely reaggravating a pre-existing injury would not in any way make Defendant's conduct less egregious, that some of the injuries may have been pre-existing or "superficial" does not in any way negate the accurate statement in the PSR that Defendant purposefully injured participants.

Defendant also objects to information in the PSR concerning UCC5 and UCC6 and whether those individuals were afraid of Defendant and reluctantly participated in the staged collision. Def. Obj. at 6. The PSR, however, accurately presents the different statements and perspectives by different participants, and Defendant does not dispute this. PSR, ¶¶ 236-242.

Similarly, with regard to Defendant's other factual objections to the PSR, the PSR accurately presents the information that Defendant claims is somehow missing. *See e.g.,* Def. Obj. at 8 (claiming domestic violence charges in the PSR were dismissed); PSR, ¶ 456 (clearly indicating that the charges were dismissed).

Finally, Defendant takes issue with the PSR's non-application of a 2-point reduction pursuant to U.S.S.G. § 4C.1.1 because Defendant presents with zero criminal history points. Def. Obj. at 8-11. Although it does not impact either the Government's nor Defendant's recommendation, the PSR is correct in not providing Defendant with a zero-point reduction, because Defendant received an aggravating role enhancement under § 3B1.1. Defendant suggests that an aggravating role enhancement does not in and of itself disqualify Defendant from the zero-point

reduction unless he was also engaged in continuing criminal enterprise as defined in 21 U.S.C. § 848.  However, this interpretation not only ignores the considerable body of caselaw interpreting the prior version of § 4C1.1(a)(10), but that the clarifying and non-substantive changes to the sentencing guidelines set to take effect on November 1, 2024, expressly preclude this argument and make clear that an aggravating role enhancement does itself preclude application of the zero-point reduction.[3]  While the United States' position is that Defendant would be further precluded from application of a zero-point reduction because his conduct caused serious bodily injury and because Defendant used violence, the Court need not determine that in order to conclusively determine that the zero-point reduction does not apply.

IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

Pursuant to 18 U.S.C. § 3553(a), the Court must impose a sentence that is

---

[3]    https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202405_RF.pdf, p. 42 ("The Commission intended §4C1.1(a)(10) to track the safety valve criteria at 18 U.S.C. § 3553(f)(4), such that defendants are ineligible for safety valve relief if they either have an aggravating role or engaged in a continuing criminal enterprise. It is not required to demonstrate both. *See, e.g., United States v. Bazel*, 80 F.3d 1140, 1143 (6th Cir. 1996); *United States v. Draheim*, 958 F.3d 651, 660 (7th Cir. 2020). To clarify the Commission's intention that a defendant is ineligible for the adjustment if the defendant meets either of the disqualifying conditions in the provision, the amendment makes technical changes to §4C1.1 to divide subsection (a)(10) into two separate provisions (subsections (a)(10) and (a)(11))."); *see also United States v. Cervantes,* 109 F.4th 944, 946-47 (7th Cir. 2024)*; United States v. Kealoha,* 2024 WL 1202377  * 3 and n. 3 (D. Hawaii March 19, 2024) (collecting cases); *United States v. Ambriz*, 2024 WL 1156453 (W.D. Wash. March 18, 2024).

UNITED STATES' SENTENCING MEMORANDUM – 6

sufficient, but no greater than necessary, upon consideration of the following factors: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense, as well as to afford deterrence, protect the public from further crimes of the defendant and provide the defendant training and treatment; (3) the kinds of sentences available; (4) the established Guidelines sentencing ranges; (5) the need to avoid unwarranted sentence disparity between defendants with similar records convicted of similar crimes; and (6) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). Here, under the totality of the factors, the jointly-recommended sentence of 144 months of incarceration is sufficient, but no greater than necessary.

(1) *The nature and circumstances of the offense and history and characteristics of the Defendant;*

As documented in detail in the PSR, the offense conduct is exceptionally egregious. For more than six years, Defendant, together with dozens of co-conspirators that he recruited, coerced, and directed, deliberately and elaborately staged a series of automobile and boat collisions, as well as staged stair fall and other injury incidents, in at least four separate judicial districts. PSR, ¶¶ 31, 43, 56-415. These events were scripted, rehearsed, and carried out to maximize the financial gain to Defendant. *Id.* Defendant acted as the principal architect, ringleader, and mastermind of the scheme and conspiracy; in fact, most often, Defendant was the driver of the "at-fault" vehicle that intentionally rammed into the vehicle containing his co-conspirators. PSR, ¶ 44. Prior to a staged collision, Defendant intentionally inflicted injuries on a co-conspirator to defraud first responders and insurance companies in order to make the collisions and injuries seem more serious and to increase the insurance payouts. PSR, ¶ 45. Defendant used a slew of false names and identities, both for himself and for co-conspirators, to perpetrate the fraud. PSR, ¶¶ 32-42. Defendant and his co-conspirators fraudulently obtained at least

$6,757,209.99 through the fraud.  PSR, ¶ 433.  Not content with the millions of dollars that he fraudulently obtained, Defendant also defrauded the public out of more than $400,000 by knowingly and intentionally cheating on his taxes.  PSR, ¶¶ 417-420.

After being indicted twice and released pending trial, Defendant then fled and absconded from supervision in advance of a final pretrial conference before the Court, left the judicial district, and lived at large for more than 4 years in a brazen attempt to avoid accountability for his crimes.  PSR, ¶¶ 421-424.  Defendant was finally arrested in Florida in November 2023, living under a false name on a boat with false identification documents, and illegally in possession of firearms and ammunition, as well as controlled substances and prescription drugs that he fraudulently obtained.  ECF No. 1018; Search and Arrest Reports, Exhibit 3 attached hereto. The size, scope, and complexity of Defendant's fraud was matched only by, if anything, his insistence on evading accountability for his actions, while his family, friends, and co-conspirators took the fall.

Defendant's crime, while directly perpetrated on insurance companies, had much greater impacts.  Defendant not only inflicted significant injuries on his co-conspirators, but by intentionally ramming vehicles at high speeds on public roads, placed the community in significant danger.  Additionally, Defendant harmed the community by pulling into his web numerous friends and family members who had never engaged in criminal conduct and, absent Defendant, very likely never would have.  While those individuals are responsible for their own choices, so is Defendant, and his choices resulted in making felons of family and friends who had little or no prior interaction with criminal conduct.  Defendant's recruited co-conspirators included his spouse, his own children, children-in-law, and a younger relative who viewed Defendant as a parental figure. PSR, ¶¶ 33-36.  As if that were not enough, he then left those friends and family who were significantly less culpable than Defendant holding the bag while he fled justice and accountability.

UNITED STATES' SENTENCING MEMORANDUM – 8

As has been well-documented, insurance fraud also carries significant risks and harm to the community.    Insurance fraud causes significant increases in premiums and deductibles.[4]    This means that owning and operating a vehicle, which is already a significant financial burden and pressure for innocent families and community-members who have done nothing wrong, is that much more difficult. Having a reliable and affordable vehicle is one of the most critical aspects to being able to work, for access to nutritious food and medical care, for transportation to education, and other basic necessities of American life.[5] These impacts are not just felt by vehicle owners, but anyone who rents a vehicle or hails a taxi or rideshare, because those costs are significantly driven by insurance costs.

Defendant's history and characteristics also compel a significant sentence of incarceration.    Defendant has no significant criminal history prior to this matter, which normally augurs in favor of a more lenient sentence.    In this case, however, that is largely, if not completely, counterbalanced by the sheer scope and length of the fraud, as well as the additional tax crimes and of course the flight from justice. Moreover, Defendant's crimes were not the result of aberrant judgment or a momentary lapse in control or good behavior; rather, they were the product of a

---

[4]    *See, e.g.,* https://www.fbi.gov/stats-services/publications/insurance-fraud (insurance fraud, not including health insurance, causes more than $40 billion each year and costs the average American family between $400 and $700 each year in increased vehicle insurance premiums).

[5]    *See, e.g.,* https://www.bts.gov/content/average-cost-owning-and-operating-automobilea-assuming-15000-vehicle-miles-year (cost of owning and operating a vehicle between $8,000 and $10,000 per year during the relevant time period); https://www.usnews.com/news/health-news/articles/2024-01-11/millions-of-americans-lack-reliable-transportation (discussing importance of reliable transportation to work, medical care, and other critical needs).

UNITED STATES' SENTENCING MEMORANDUM – 9

conscious decision and choice, taking place over years if not decades, to live a criminal lifestyle in which laws were for others and Defendant hurt and endangered people, physically and financially, to enjoy his own lavish lifestyle. Few if any of the factors that usually compel lighter sentences for first-time offenders apply here.

> (2) *The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense, as well as to afford deterrence, protect the public from further crimes of the defendant and provide the defendant training and treatment*

As discussed above, the jointly-recommended sentence of 144 months is sufficient, but no greater than necessary, to reflect the seriousness of Defendant's criminal conduct. The jointly recommended sentence is also the minimum sentence sufficient to promote respect for the law, particularly in light of Defendant's flight from supervision.

Additionally, the jointly recommended sentence is necessary to promote both specific and general deterrence. Defendant's crimes, like most financial crimes, were not of necessity or a product of a criminal lifestyle or upbringing, but were driven by calculation and greed – pure and simple. A significant custodial sentence not only provides critical accountability for Defendant's conduct, but serves as a powerful deterrent to other would-be fraudsters. Courts have frequently recognized the importance of general deterrence in financial crimes, even if punishment is of limited deterrent value with respect to other types of crimes. *See, e.g., United States v. Heffernan,* 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."

UNITED STATES' SENTENCING MEMORANDUM – 10

(quotation marks and citation omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). Defendant's crimes were not only rational, cool, and calculated, but meticulously planned and carried out over many years in an organized fashion; thus, they are prime candidates for general deterrence.

The jointly-recommended sentence is also necessary to promote specific deterrence. Defendant is 63 years old, and, while he reports having owned restaurants, bars, and a limousine service, as well as real estate investments, the PSR has no information verifying any legitimate employment history. PSR, ¶¶ 487-488. Indeed, a search of public records both in Nevada and in Washington yields no records for any businesses owned or operated by Defendant.[6] At a minimum since moving to Eastern Washington in 2006, it appears that Defendant's adult life has been dedicated to fraud and other illegitimate forms of income. The recommended sentence is necessary to ensure that, at least for the next decade and into his 70s, Defendant does not resort to further fraud as a means to fuel the fast-paced lifestyle with which he, by his own admission, grew accustomed.

(3) *The kinds of sentences available*

(4) *The established Guidelines sentencing ranges*

Here, the correctly-calculated sentencing guideline range is 168-210 months. Accordingly, the jointly-recommended Fed. R. Crim. P. 11(c)(1)(C) sentence of 144 months is 14 months (approximately 8%) below the low end of the sentencing guideline range.

(5) *the need to avoid unwarranted sentence disparity between defendants with similar records convicted of similar crimes*

---

[6] https://esos.nv.gov/EntitySearch/OnlineBusinessAndMarkSearchResult; https://ccfs.sos.wa.gov/#/AdvancedSearch

UNITED STATES' SENTENCING MEMORANDUM – 11

In this case, nearly all of Defendant's co-defendants have already been sentenced for participating in the staged collision scheme and conspiracy. PSR, ¶¶ 8-28. Their sentences have ranged from time served/probation to 70 months incarceration in the case of Defendant's spouse. *Id.* While Defendant's spouse is the next-most culpable co-conspirator, her culpability is far, far less than Defendant's. Defendant was not only the ringleader and principal architect of the scheme and conspiracy, but recruited co-conspirators, planned the collisions, caused pre-staged collision injuries and staged the collisions complete with props, scripts, actors, and storyboards, carried out the staged collisions, created and filed false insurance documentation, and pocketed the lion's share of the proceeds. Defendant also fled from supervision and remained at large for more than four years while his co-conspirators were convicted and sentenced of participating in a scheme that Defendant orchestrated, leaving his co-conspirators to face the music while he attempted to evade accountability. It is therefore appropriate that he be sentenced to 144 months of imprisonment, more than twice the sentence of his most culpable co-conspirator.

Other Defendants who participated in similar schemes also received significant sentences of incarceration. For example, a defendant in Florida who orchestrated a staged collision scheme that resulted in $4,351,082 in losses, received a 96-month sentence in 2012. *See U.S. v. Oscar Luis Franco Padron*, 9:11-cr-80106-KAM (S.D. Fla.), ECF No. 236. Here in the Eastern District of Washington, one of the primary architects of a different staged collision scheme, was sentenced to 42 months of imprisonment in a staged collision scheme that involved only $126,990 in losses, a tiny fraction of the losses at issue in this case. *See U.S. v. Yaser*, 4:21-cr-06042-MKD-1, ECF No. 743. The jointly-recommended 144 sentence in this matter as compared to those cases is warranted and necessitated by Defendant's greater culpability, the far greater loss amount, the extent of the fraud (dozens of staged collisions taking place over many years), the physical injuries

caused that Defendant personally inflicted on participants, Defendant's tax crimes, and Defendant's 4-year flight from supervision and relevant conduct attendant thereto, including living under a false name, unlawfully possessing a firearm, possessing controlled substances acquired under a false name, and other criminal conduct.

(6) *the need to provide restitution to the victims of the offense*

The jointly-agreed upon restitution amount of $6,757,209.99, joint and several in part as set forth in the PSR and Plea Agreement, is necessary in order to fully compensate victims for the pecuniary harm caused by Defendant's conduct. PSR, ¶¶ 518-537. Additionally, restitution of $436,399 due to the Internal Revenue Service in the tax fraud case is necessary and required in order to fully compensate the public for the pecuniary harm caused by Defendant's tax crimes. PSR, ¶ 538. Total restitution should therefore be ordered in the amount of $7,193,608.99. Given the extent of restitution and Defendant's apparent inability to pay an additional fine, no additional criminal fine is recommended by the United States.

Finally, the joint recommendation for 3 years of supervised release following the period of incarceration and proposed conditions as set forth in the Plea Agreement and PSR, are necessary to ensure that the public is protected from any further financial crimes, as well as to provide for restitution to the victim.

V.    Conclusion

In conclusion, the jointly-recommended Fed. R. Crim. P. 11(c)(1)(C) sentence of 144 months of incarceration is the minimum sentence sufficient, but no greater than necessary, to address the totality of the section 3553(a) sentencing factors. As detailed in the Plea Agreement, the parties' joint recommendation is for a sentence of 138 months for the wire and mail fraud conspiracy (Case No. 2:18-cr-00232-TOR-1) to run concurrently with a sentence of 36 months for Making and Subscribing False Income Tax Returns (Case No. 2-19-CR-00021-TOR-1), and a 6-

//

month consecutive sentence for Failure to Appear (2:20-CR-000145-TOR). The United States submits that a lesser sentence would not be sufficient under the circumstances.

Respectfully submitted,

Vanessa R. Waldref
United States Attorney
Eastern District of Washington


*Dan Fruchter*
Dan Fruchter
Jeremy J. Kelley
Assistant United States Attorneys
Eastern District of Washington

UNITED STATES' SENTENCING MEMORANDUM – 14

1

### ***CERTIFICATE OF SERVICE***

2

3       I hereby certify that on October 23, 2024, I caused the foregoing to be filed

4   with the Clerk of the Court using the CM/ECF System and service of such filing will

5   be sent by reliable electronic means to the counsel of record.

6

7                                  *Dan Fruchter*
                                   Dan Fruchter
8                                  Jeremy J. Kelley
9                                  Assistant United States Attorneys

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES' SENTENCING MEMORANDUM – 15